## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## TAMPA CROWN DISTRIBUTORS, INC., Respondent.

### No. 17672.

United States Court of Appeals
Fifth Circuit.

Nov. 10, 1959.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas J. McDermott, Assoc. Gen. Counsel, NLRB, Washington, D. C., Jerome D. Fenton, Gen. Counsel, Norton J. Come, Deputy Asst. Gen. Counsel, Russell Specter, Atty., NLRB, Washington, D. C., for petitioner.

T. Charles Allen, Atlanta, Ga., Fisher, Phillips & Allen, Atlanta, Ga., for respondent.

Before RIVES, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

RIVES, Chief Judge.

While the ruling of the Board on the earlier representation proceeding [1] was not subject to direct review under the statute, that ruling is subject to challenge when, as here, a complaint of unfair practices is made predicated upon the ruling.[2]

1. Reported in 118 N.L.R.B. 1420.

2. National Labor Relations Board v. Huntsville Mfg. Co., 5 Cir., 1953, 203 F. 2d 430, 434; National Labor Relations Board v. Dallas City Packing Co., 5 Cir., 1958, 251 F.2d 663, 665; Compare Pittsburgh Plate Glass Co. v. National Labor Relations Board, 1941, 313 U.S. 146, 154, 161, 61 S.Ct. 908, 85 L.Ed. 1251.

The parties agree that the questions presented for decision are:

"1. Whether the Board properly concluded that the conduct alleged by respondent did not warrant setting aside the election, and that thus respondent's failure to honor the certification based thereon was violative of Section 8(a)(5) and (1) of the Act [29 U.S.C.A. § 158(a) (1, 5)].

"2. Whether the Board properly concluded that respondent further violated Section 8(a)(5) and (1) of the Act by granting a wage increase, without notice to or consultation with the Union."

█ Decision of the first question may also preclude the second. We hold that the Board erred in certifying the Union instead of setting aside the representation election, and we therefore deny enforcement.

The evidentiary facts are not in dispute. An election under the direction and supervision of the Board's Regional Director was conducted on June 7, 1957. Nine votes were cast. The Regional Director found that a challenge to one vote cast by an ex-employee should be sustained, and that finding has not been questioned. Of the eight eligible employees, four voted for the Union, three against it, and the eighth cast a blank ballot.

Two nights before the election, employee Roland Paz received an anonymous telephone call at his home, which he described as follows:

"A. They told me, 'How much do you love your daughter?' I said, 'I love my daughter'; and he said something like this, 'You better vote for the Union.'

"Q. And did you ask him who was calling?

"A. And he told me to tell Leo the same thing.

"Q. Did you ask who it was speaking?

"A. No, he didn't give me a chance; he hung up."

Paz did not recognize the voice of the caller. He testified:

"Q. Do you know, are you familiar with the way the people who work for Tampa Crown talk? A. Yes.

"Q. Are you familiar with their voices? A. Yes.

"Q. Do you think you would recognize their voices if you heard any of them on the telephone? A. Oh, yes.

"Q. Was it anybody, any person who works for Tampa Crown, any of the officers, who talked to you on the telephone? A. I don't think so.

"Q. Was it, do you think, an American voice? A. Yes.

"Q. Or a Latin voice? A. No, an American voice."

Paz did not communicate the threatening conversation to any of respondent's other employees until after the election. He voted for the Union.

The "Leo" referred to in the conversation with Paz was employee Lionel M. Sardinas. The night before the election, Sardinas received an anonymous telephone call at his home, which he described as follows:

"A. Well, when they called up they asked for me, and I was there with my baby.

*    *    *    *    *    *

"Q. Did the voice, the man unidentified, tell you who he was? A. No, he didn't.

"Q. Did he ask you if this was Leo speaking? A. That is right.

"Q. What did he say and what did you say, Leo; everything that you can recall about that conversation, all of it? A. Well, he said to me, 'Better watch out for the following day on that Union election'; and I started—I figured he was threatening me, so I started cuss-

ing him, and he said if I cared for my kids to be careful."

Sardinas could not identify the voice of his anonymous caller. He testified:

"Q. Are you familiar with the voices of the people who work for Tampa Crown—Mr. Diaz, Mr. Lorenzo, Mr. Lane and the other salesmen, the manager, and so forth? A. Yes.

"Q. Are you familiar with the warehouse shipping clerk's voice? A. That is right.

"Q. Would you recognize them over the telephone? Have you talked to them over the telephone? A. Yes.

"Q. Would any of these people you heard, as far as you know, identify the voice over the telephone? A. No.

"Q. Leo, if you can recall, or do you recall whether it was a Latin voice or an American voice, the accent? A. The way they spoke English it didn't sound like a Latin voice to me."

Sardinas did not tell any of the other employees about the threatening conversation until after the election. He was, however, later on the night of the call, visited by a group of employees and the ex-employee whose vote on the next day was challenged. That evening there had been a Union meeting. At the meeting the ex-employee and several employees, including Paz, and some Union officials discussed the election set for the next day. Comment was made that the Union might lose the election if employee Sardinas voted against the Union. When the meeting broke up, it was suggested that the group (now reduced to 4 or 5 employees and the ex-employee) visit Sardinas to talk to him about his vote. This group urged Sardinas to vote for the Union, but Sardinas demurred on the ground that a member of his family worked for the Company in a supervisory capacity and he did not want to be "on the spot with the Company." Paz suggested that Sardinas cast a blank ballot and Sardinas agreed.

In its decision in the representation proceeding, the Board stated the test as follows:

"  *   *   *   In the absence of evidence that threatening or coercive conduct is attributable to one of the participating parties, the Board will not set an election aside,[3] unless the character of the conduct is so aggravated as to create a general atmosphere of fear and reprisal rendering a free expression of choice of representatives impossible.[4]

"3.   J. Spevak & Co., Inc., 110 NLRB 954; White's Uvalde Mines, 110 NLRB 278; Gruen Watch Company, 108 NLRB 611; Marman Bag Company, Inc., 103 NLRB 456; J. J. Newberry Company, 100 NLRB 84.

"4.   Poinsett Lumber and Manufacturing Company, 116 NLRB 1732; The Falmouth Co., 114 NLRB 896; Diamond State Poultry Co., 107 NLRB 3."

The respondent insists that the "agency" test and the "atmosphere of fear" test should not be the exclusive means of determining whether specific conduct renders improbable or impossible the employee's free choice, and refers in its brief to earlier Board decisions, as follows:

"In Stern Brothers, 87 N.L.R.B. 16, The Board said: 'Not only under the mandate of the National Labor Relations Act, but pursuant to American democratic tradition, this Board should erect and maintain every practical safeguard to insure that the results of its elections represent the free will of employee.' "

"In The Falmouth Company, 114 N.L.R.B. 896, The Board held: 'The important fact is that conditions existed which prevented a free choice.' "

"In G. H. Hess, Inc., 82 N.L.R.B. 463, the Board stated: 'An election serves its purpose only if it affords.

an opportunity for All employees to register a free choice of bargaining representatives.' "

"In U. S. Rubber Company, 83 N.L.R.B. 3, The Board stated: 'Accordingly, the number of instances of interference, or the number of employees directly involved, are not material to the issue. When, as here, two employees have been interfered with in their choice of representatives, the requirements for a wholly free and uncoerced election have not been fulfilled.' "

"In New York Telephone Co., 109 N.L.R.B. 788, a case concerning nothing more than 'doubts' about certain temporarily misplaced ballots in an election conducted by mail, the Board held: 'Where, as here, the irregularity concerns an essential condition of an election, and *such irregularity exposes to question a sufficient number of ballots to affect the outcome of an election,* in the interest of maintaining our standards there appears no alternative but to set aside and to direct a new election.' (Emphasis supplied.)"

We need not decide whether the "agency" and the "atmosphere of fear" tests are exclusive, for those tests themselves require us to deny enforcement of the Board's decision.

Any exact application of the "agency" test is impracticable or impossible in the case of anonymous telephone threats. The proof here adduced was prima facie sufficient, we think, when the Union business agents and other Union officials did not take the stand and deny that the Union was responsible for or had knowledge of the telephone threats.

A more conclusive result is attained by applying the "atmosphere of fear" test when it is recognized that the evidence establishes fear in the minds of two voters of a total unit of eight, that fear affected their votes, and that, had it not been for that fear, the results of the election might have been different.

Clearly, it is improbable, if not impossible, that the result of the election represented the employees' free choice. Enforcement is therefore

Denied.