MARRIOTT IN–FLITE SERVICES DIVI-
SION OF MARRIOTT CORPORA-
TION, Petitioner-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent-Petitioner.

NATIONAL LABOR RELATIONS
BOARD, Respondent-Petitioner,

v.

MARRIOTT IN–FLITE SERVICES DIVI-
SION OF MARRIOTT CORPORA-
TION, Petitioner-Respondent.

No. 26177.

United States Court of Appeals
Fifth Circuit.

Oct. 7, 1969.

R. Theodore Clark, Jr., John T. Weise, Seyfarth, Shaw, Fairweather & Gerald-son, Chicago, Ill., C. Dale Stout, Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Ross M. Madden, Director, N.L.R.B., Chicago, Ill., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Robert A. Giannasi, Attys., N.L.R.B., for respondent.

Irving M. Friedman, Chicago, Ill., Robert A. Giannasi, Atty., N.L.R.B., Washington, D. C., Harold A. Katz, Katz & Friedman, Chicago, Ill., C. Paul Barker, New Orleans, La., Howard Schulman, New York City, of counsel, for intervenor.

Before WISDOM and CARSWELL, Circuit Judges, and ROBERTS, District Judge.

WISDOM, Circuit Judge:

Marriott In-Flite Services Division of Marriott Corp. challenges the manner in which the Labor Board conducted a representation election, and particularly the Board's refusal to provide ballots in Spanish for Spanish-speaking employees. We agree with the employer that the Board's policies do require that foreign-language ballots be available where a substantial number of eligible employees do not speak English, and that such ballots must be provided to allow a fair election. We therefore set aside the order of the Board.

Marriott, with its principal place of business in Georgia, employs about 640 people in three "flight kitchens" at O'Hare Airport near Chicago. The company provides food and beverages for airlines to use on their flights.

On February 9, 1966, Local 300, United Industrial Workers of America, Seafarers International Union of North America, AFL-CIO asked for recognition by Marriott as the statutory bargaining agent for employees of the O'Hare kitchens, on the ground that it had an authorization-card majority. Marriott withheld recognition, and filed a petition for an election with the Board's Office for Region 13 in Chicago.

On February 21 lawyers for the union and the company met with a representative of the Regional Office to agree upon election procedures and details. Both sides asked that the Board provide election notices and ballots in Spanish as well as English, since one-third of the employees in the unit spoke and understood Spanish only. The Board representative agreed with regard to the notices and said that he would arrange for ballots in Spanish if the Board's policies permitted them. The union and the company then signed a stipulation, incorporating the various precedures to apply at the consent election. They agreed, among other things, that

> * * * Said election shall be held in accordance with the National Labor Relations Act, the Board's Rules and Regulations, and the applicable procedures and policies of the Board.

The election notices distributed by the Board were, except for a sample ballot, bilingual. At the election on March 18, however, only ballots in English were provided. The union won the balloting, 299 to 203 with 60 ballots challenged and still unopened. The company filed objections to the election on March 25, alleging 15 separate defects, and requested a hearing on any relevant issues of fact. The Regional Director recommended, without a hearing, overruling 14 of the 15 objections on the basis of the evidence submitted by the parties. He directed a hearing on the other issue, whether the election should be set aside because of certain alleged threats, coercion, and violence. Under Section 102.69(d) and(e) of its rules, the Board ordered the recommended hearing, after which the hearing examiner concluded that the company's objection should be overruled. The Board then adopted the findings of the hearing examiner as well as the findings of the Regional Director on the remaining issues. It certified Local 300 as the bargaining agent for the unit on June 16, 1967. The company, however, refused to bargain with the union. The union filed unfair labor practice charges under § 8(a) (5) of the Act. The Board held that the election had been valid, and ordered the company to bargain with Local 300 as the statutory bargaining agent for the unit.

## I.

■ Marriott directs our attention first to the Labor Board's policy and practice with regard to foreign-language ballots.[1] The Board, in conducting representation elections, has almost uniformly provided such ballots where foreign speaking employees comprise a substantial portion of the eligible voters. The record in the case before us contains letters to Marriott's lawyer from the Board's regional offices about their respective practice in this regard. Of those regions in which the question had been raised, only one, Region 13 (where this case originated), replied that it does not provide foreign-language ballots. The eighteen other regions that had considered the problem stated unanimously that they had or would, when the occasion arose, employ foreign-language ballots.[2] More importantly, the Associate Executive Secretary of the Labor Board declared that "the Agency does have a uniform policy" on such ballots, and he went on to describe it:

As the [Regional] Director deems it necessary, election notices in a foreign language may be posted and in such cases, the foreign language used on the notice should also appear on the ballot. Because many of our Regions have no recourse to such a procedure, it is understandable that some of them may have advised you that their policy is contrary to that stated above.

Further indication of the Board's policy appears in Fibre Leather Mfg. Corp., 1967, 167 NLRB No. 57, 66 LRRM 1056, in which the Board set aside an election where only English ballots had been available, and where less than one-fourth of the eligible voters could not understand English. There the Board said,

we are not satisfied that the conditions under which the election was conducted were such as to assure the effective and informed expression by all employees of their true desire. 66 LRRM at 1057.

In contrast with the Board's "uniform policy", Region 13 at the time this case arose had a policy *never* to grant foreign-language balloting. The regional office wrote to Marriott's lawyer that "all our ballots are printed in English and we have made no exception to this rule". Region 13, in other words, has refused in the past to make even the case-by-case determination of need mandated by the "uniform policy" of the Board in Washington. (We should stress the reference to the past, because Region 13 has more recently announced that it will in the future provide foreign-language ballots where a language problem exists. This about-face further points up the isolated nature of the Region's former rule requiring English ballots.)

■ From the record before us it appears, therefore, that the Board, through its agents, allowed employees certain rights in one geographic area, and different, more extensive, rights in all other geographic areas without offering any justification for the disparate treatment. The agency fails to explain why the difficulties Chicago employees have with English condemn them to more restricted voting rights than those enjoyed by similarly handicapped workers in Milwaukee. If the agency establishes a general policy and then departs from it, judicial approval of the departure will be withheld in the absence of an explanation. Thus

1. The unfair labor practice procedure is, of course, a proper method of obtaining review of the record of the representation election proceedings. *See, e. g.,* NLRB v. Tampa Crown Distributors, Inc., 5 Cir. 1959, 272 F.2d 470.

2. Replying affirmatively were Regions 2 (New York), 3 (Buffalo), 4 (Philadelphia), 7 (Detroit), 8 (Cleveland), 12 (Tampa), 15 (New Orleans), 16 (Fort Worth), 17 (Kansas City), 20 (San Francisco), 21 (Los Angeles), 22 (Newark), 23 (Houston), 24 (San Juan), 28 (Albuquerque), 29 (Brooklyn), 30 (Milwaukee), and 31 (Los Angeles).

Region 8 said that it provides foreign-language ballots only when all members of the unit speak the same foreign language.

in Rayonier, Inc. v. NLRB, 5 Cir. 1967, 380 F.2d 187, We denied enforcement of a Board order and quoted approvingly the following language of Judge Aldrich:

"The Board is free, of course, to make changes in policy, but the seriousness of this one, if that is what it is, would call not only for deep and mature thought, but for the assembly of the most cogent reasons. In the Board's opinion I find neither. [Northeast Airlines v. C.A.B., 1 Cir. 1964, 331 F.2d 579, 589]." 380 F.2d at 190.

Similarly, Judge Brown, concurring in Mary Carter Paint Co. v. FTC, 5 Cir. 1964, 333 F.2d 654, rev'd on other grounds, 1965, 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128, pointed out that

[the] law does not permit an agency to grant to one person the right to do that which it denies to another similarly situated. There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case.

That description fits exactly the Board's conduct here.

More recently, in Delta Drilling Co. v. NLRB, 5 Cir. 1969, 406 F.2d 109, this Court set aside an election in which the Board's agent had stopped off at a union representative's motel room while carrying the ballots away from the polling place. No evidence of ballot-tampering appeared. We noted, however, that the agent's behavior violated "established Board policy", 406 F.2d at 112, and that "[s]uch policies are controlling until the Board announces a change and its reasons for the change." 406 F.2d at 113. The Court in Delta Drilling also stressed the binding nature of a consent agreement saying that an employer who enters into it "relying upon the unflinching preservation of Board policy, is entitled to the benefit of that reliance". 406 F.2d at 114. In our case, as in Delta Drilling, the consent agreement provided that election procedures would follow Board policy, and the agreement is there-

fore an added reason for requiring adherence to that policy.

The Board in its brief denies that it follows the practices and policies attributed to it by Marriott. It notes that in Fibre Leather Mfg. Corp. neither the election notices nor the ballots had been bilingual, while in the present case at least the notices had been printed in Spanish. The Board also points to the decision in Thomas A. Nelson d/b/a Trio Metal Cap. Co., 1967, 168 NLRB No. 105, as further proof that the alleged policy does not exist. In Nelson the Board refused to set aside an election where the ballots had been in English only, but where the election notices had been bilingual.

We do not find these arguments persuasive. The grounds for distinguishing Fibre Leather, i. e., the absence of bilingual election notices are clearly refuted by the letter of the Associate Executive Director, which was written after Nelson, and which speaks explicitly of the need for foreign-language notices and ballots. Nor is it dispositive that the Board approved, after the fact, the Regional Director's denial of foreign-language ballots in Nelson. Nelson arose in Region 13, where the present case also originated. It merely emphasizes that that region was out of step with the rest of the country. The Board cannot, by retrospective adjudication, will away the policy that is actually being enforced by its agents and officers in day-to-day practice. After Nelson, as we noted, all regions save one continued to provide ballots in foreign languages; the Board accepted their policy as its own. As we said in Delta Drilling, "Board policy is to be ascertained from its acts and decisions". 406 F.2d 112. The acts described by the various regions and summarized by the Associate Executive Director are what we look to here, and we cannot escape the fact that while Region 13 followed one rule, Washington and the other regions were following another.

More fundamental than the hobgoblin of little minds is the requirement that

minimum standards of fairness must be met for an election to be valid:

> In election proceedings, it is the function of the Board to provide "a laboratory" in which an experiment to determine the uninhibited desires of the employees may be conducted under conditions as nearly ideal as possible. When and if the standards of election campaigning drop too low, the requisite laboratory conditions are not present, and the experiment must be conducted over again. General Shoe Corporation, 77 NLRB No. 18, 21 LRRM 1337, 1341 (1949).

*See also* Electra Mfg. Co. v. NLRB, 5 Cir. 1969, 408 F.2d 570, Tyler Pipe and Foundry Co. v. NLRB, 5 Cir. 1969, 406 F.2d 1272, and NLRB v. Monroe Auto Equipment Co., Hartwell Div., 5 Cir. 1969, 406 F.2d 177.

■■ An election in which one-third of the electorate has no access to ballots in language that it can understand necessarily falls below the minimum laboratory standards of fairness. The "uniform policy" of the Board in providing such ballots does not prove that they are required by statute, but it is evidence of their importance. Even without that evidence, however, common sense leads us to the same conclusion: it would be whimsical to establish meticulous safeguards against coercion,[3] misinformation,[4] and corruption[5] if a sizeable portion of the electorate, though untrammeled in its choice, does not know how to exercise it. We can think of few things more fundamental to a democratic selection of labor representatives than the ability of the polity to cast an intelligent vote.

The Board's brief does not dispute this point. It emphasizes instead the auxiliary methods, other than the printed ballot, by which the Spanish-speaking voter might have managed to vote according to his choice. The Board points to the bilingual election notices, the presence of Spanish-speaking officials at the polls, and the simple "yes-no" choice that appeared on the ballot. Even those who did not receive help from the officials, says the Board, could hardly have mistaken the basic English words "yes" and "no".

We do not find the curative effects of notices and observers, or the simplicity of the ballot adequate to save this election. Notices are not always read. (The ones here contained no sample ballot in Spanish anyway.) Voters may be embarrassed about their unfamiliarity with English and may either vote in ignorance or stay away from the polls. Moreover, the voter's ability to recognize "yes" and "no" may not put an end to his problems. As Marriott points out, he must read the question and instructions on the ballot as well, and these may prove more troublesome. These are possibilities that cannot be resolved by speculation. Given the initial defect of improperly denied ballots, the party challenging the election should not have to prove actual prejudice to the outcome. That apparently was the conclusion of the Board in *Fibre Leather*. In that case there were no void ballots cast, in contrast to the 80 percent of the eligible voters who cast ballots in the Marriott election, more than 98 percent did so in *Fibre Leather*. Furthermore, just as no one in the present case asked for help in voting, a factor cited by the Board, so too in *Fibre Leather* "no employee approached either of the bilingual observers to ask a question or request assistance".[6]

3. *See, e. g.* NLRB v. Tampa Crown Distributors, Inc., 5 Cir. 1959, 272 F.2d 470.

4. *See, e. g.*, Electra Mfg. Co. v. NLRB, 5 Cir. 1969, 408 F.2d 570.

5. *See, e. g.*, Delta Drilling Co. v. NLRB, 5 Cir. 1969, 406 F.2d 109.

6. In *Delta Drilling* 406 F.2d at 112 this Court quoted with approval the following language from Athbro Precision Engineering Corp., 166 NLRB No. 116, 65 LRRM 1699:

> The Employer does not claim any violation of the integrity of the ballot box, nor does it claim that the conduct of the Board Agent had any effect upon the four employees who later voted. Rather, it objects that the be-

The Board further suggests that in a labor election provisions should not be read to grant voters' rights that are more liberal than those guaranteed in political elections, citing NLRB v. A. J. Tower Co., 1946, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322. The Supreme Court in *Tower* made no such holding, but did say, among other things that,

> the Board must act so as to give effect to the principle of majority rule set forth in § 9(a), a rule that "is sanctioned by our governmental practices by business procedure, and by the whole philosophy of democratic institutions." S.Rep.No. 573, 74th Cong. 1st Sess. p. 13. It is within this democratic framework that the Board must adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently and speedily. 329 U.S. at 331, 67 S.Ct. at 328, 91 L.Ed. at 327.

The Court also stressed the need for "practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud." 329 U.S. at 331, 67 S.Ct. at 328. The practical problems of providing ballots for every linguistic minority in a large state are quite different from the practical problems of providing 200 ballots in one language and 440 in another.

What comprises fairness to the minority in the one case does not necessarily define fairness to the minority in the other. If nothing else, the "uniform policy" of the Board attests to the feasibility of accommodating foreign-speaking employees.

## II.

The intervenor, Local 300, and the Board both argue that even if the company had a valid objection to the balloting procedure, the objection was lost when the company failed to appeal *before* the election from the Regional Director's decision. The record shows, however, that the Stipulation for Certification Upon Consent contained a commitment from the Board to conduct the election according to the "applicable procedures and policies of the Board". Since, as we have said, the Board's policy supported the request made by both the union and the company at the time, and since the Board's agent had agreed to provide Spanish ballots if policy permitted, there was no need to pursue the matter farther. No waiver occurred.

Accordingly, we set aside the election of March 18, 1966, and direct that another election be held. We find no merit to the employer's other contentions.

Enforcement denied.

havior of the Board Agent gave an appearance of irregularity to the conduct of the election thus departing from the standards of integrity which the Board seeks to maintain.

The Regional Director, while observing that a Board Agent in charge of an election should not fraternize with a representative of one of the parties in the interim between two balloting periods, nevertheless did not recommend setting aside the election. Although the Board Agent's conduct did not affect the votes of employees, we do not agree that this is the only test to apply. The Board in conducting representa-

tion elections must maintain and protect the integrity and neutrality of its procedures. The commission of an act by a Board Agent conducting an election which tends to destroy confidence in the Board's election process, or which could reasonably be interpreted as impugning the election standards we seek to maintain, is a sufficient basis for setting aside that election.

In the circumstances of this case we hereby sustain the Employer's objections. Accordingly, we shall set aside the election and direct that a second election be held."