**FEDERAL TRADE COMMISSION v. F. A. MARTOCCIO CO.**

No. 401.

Circuit Court of Appeals, Eighth Circuit.

Jan. 23, 1937.

Rehearing Denied Feb. 12, 1937.

Martin A. Morrison, Asst. Chief Counsel, Federal Trade Commission, of Washington, D. C. (W. T. Kelley, Chief Counsel, Federal

562

Trade Commission, and Henry C. Lank and James W. Nichol, Sp. Attys., Federal Trade Commission, all of Washington, D. C., on the brief), for petitioner.

Arnold L. Guesmer, of Minneapolis, Minn., for respondent.

Before STONE, SANBORN, and WOODROUGH, Circuit Judges.

STONE, Circuit Judge.

This is a proceeding brought by the Federal Trade Commission for the enforcement of a "cease and desist" order entered by it against the respondent.

Respondent is a manufacturer of candy selling its product, in interstate commerce, to wholesalers and jobbers. The candy was packed in cartons, each containing a large number of uniform small candy bars, a smaller number of one-quarter pound bars, a yet smaller number of one-half pound bars and a "push card." The candy is of good quality. The smallest bars are of the size and kind usually retailing for five cents each. A push card is a stiff pasteboard card with covered holes in each of which is a concealed number. On the card is set forth certain numbers which entitle the purchaser (who uncovers one of them) to a quarter pound bar and certain other numbers entitling to a half-pound bar. For five cents, any purchaser may uncover a number on the card. He may secure a number calling for one of the two larger size bars. If he does not, he gets a five-cent bar which is reasonably worth what he pays. The purchaser may buy a five-cent bar and pay no attention to the card. There is no requirement that the purchaser use the card in buying the small bars. These cartons of candy are sold by the wholesalers and jobbers to retailers who may use the card or not in selling the candy.

The essential portions of the "cease and desist" order are as follows:

"(1) Selling and distributing to wholesale dealers and jobbers, for resale to retail dealers, candy so packed and assembled that sales of said candy to the general public are to be made, or may be made, by means of a lottery, gaming device, or gift enterprise;

"(2) Supplying to, or placing in the hands of wholesale dealers and jobbers, packages or assortments of candy which are used, or may be used, without alteration or rearrangement of the contents of said packages or assortments, to conduct a lottery, gaming device, or gift enterprise in the sale or distribution of the candy or candy products, contained in said assortment, to the public;

"(3) Supplying to, or placing in the hands of, wholesale dealers and jobbers assortments of candy together with a device, commonly called a 'punch board' or 'push card,' for use, or which may be used, in distributing or selling said candy to the public at retail;

"(4) Furnishing to wholesale dealers and jobbers a device, commonly called a 'punch board' or 'push card,' either with packages or assortments of candy or candy products, or separately, bearing a legend, or legends, or statements, informing the purchasing public that the candy, or candy products, are being sold to the public by lot or chance, or in accordance with a sales plan which constitutes a lottery, gaming device, or gift enterprise."

Respondent has filed here its "petition to set aside Commission's order" wherein it presents 34 challenges to the findings, the conclusions or the order of the Commission.

For convenience, we treat the case by consideration of the grounds and reasons advanced by respondent in its brief why the order of the Commission should not be enforced but should be set aside. At the threshold of our inquiry we are faced with a decision of the Supreme Court upon a situation so near to this one before us that the heavy burden is upon respondent to distinguish that case from this one. In fact, this is the main task of respondent in this litigation and we find it convenient to treat most of respondent's arguments in connection therewith.

The case of Federal Trade Commission v. R. F. Keppel & Brother, Incorporated, 291 U.S. 304, at page 307, 54 S.Ct. 423, 424, 78 L.Ed. 814, involved against a candy manufacturer using a candy sales plan known as the "break and take," which is described in the opinion as follows:

"The break and take assortments are so arranged and offered for sale to consumers as to avail of the element of chance as an inducement to the retail purchasers. One assortment, consisting of 120 pieces retailing at 1 cent each, includes four pieces, each having concealed within its wrapper a single cent, so that the purchasers of those particular pieces of candy receive back the amount of the purchase price and thus ob-

tain the candy without cost. Another contains 60 pieces of candy, each having its retail price marked on a slip of paper concealed within its wrapper; 10 pieces retail at 1 cent each, 10 at 2 cents, and 40 at 3 cents. The price paid for each piece is that named on the price ticket, ascertained only after the purchaser has selected the candy and the wrapper has been removed. A third assortment consists of 200 pieces of candy, a few of which have concealed centers of different colors, the remainder having white centers. The purchasers of the candy found to have colored centers are given prizes, packed with the candy, consisting of other pieces of candy or a package containing lead pencils, penholder and ruler. Each assortment is accompanied by a display card, attractive to children, prepared by respondent for exhibition and use by the dealer in selling the candy, explaining the plan by which either the price or the amount of candy or other merchandise which the purchaser receives is affected by chance. The pieces of candy in the break and take packages are either smaller than those of the competing straight goods packages, which are sold at a comparable price without the aid of any chance feature, or they are of inferior quality."

After stating "that the practice complained of is a method of competition in interstate commerce and that it is successful in diverting trade from competitors who do not employ it" (291 U.S. 304, at page 308, 54 S.Ct. 423, 425, 78 L.Ed. 814) and that "a practice so widespread and so far reaching in its consequences is of public concern" (291 U.S. 304, at page 308, 54 S.Ct. 423, 425, 78 L.Ed. 814), the court discussed and determined the unfairness of the method. After stating that the case of Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729, had decided that "A method of competition which casts upon one's competitors the burden of the loss of business unless they will descend to a practice which they are under a powerful moral compulsion not to adopt, even though it is not criminal, was thought to involve the kind of unfairness at which the statute was aimed" (291 U.S. 304, at page 313, 54 S.Ct. 423, 426, 78 L.Ed. 814), the court continued as follows: "The practice in this case presents the same dilemma to competitors, and we can perceive no reason for distinguishing between the element of chance as employed here and the element of deception involved in labelling cotton goods 'Natural Wool,' as in the Winsted Case. It is true that the statute does not

authorize regulation which has no purpose other than that of relieving merchants from troublesome competition or of censoring the morals of business men. But here the competitive method is shown to exploit consumers, children, who are unable to protect themselves. It employs a device whereby the amount of the return they receive from the expenditure of money is made to depend upon chance. Such devices have met with condemnation throughout the community. Without inquiring whether, as respondent contends, the criminal statutes imposing penalties on gambling, lotteries and the like, fail to reach this particular practice in most or any of the states, it is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy. For these reasons a large share of the industry holds out against the device, despite ensuing loss in trade, or bows reluctantly to what it brands unscrupulous. It would seem a gross perversion of the normal meaning of the word, which is the first criterion of statutory construction, to hold that the method is not 'unfair.' See Federal Trade Comm. v. Royal Milling Co., supra, 288 U.S. 212, at page 217, 53 S.Ct. 335, 77 L.Ed. 706; Federal Trade Comm. v. Algoma Lumber Co., supra, 291 U.S. 67 [at page 81], 54 S.Ct. 315, 78 L.Ed. 655."

From the above statements concerning the issues in and the above quotations from the Keppel Case, appear two matters vital here. One of these is that the court broadly asserted that "the element of chance as employed" there was an unfair method of competition within the Federal Trade Commission Act (section 5 [15 U.S.C.A. § 45]). The other is that the "element of chance" there employed would seem to be not different in essentials from the method employed here. We now turn to consideration of the reasons advanced by respondent to distinguish this case.

■ (1) Respondent contends there is no element of "chance" in a true sense present in its method because there is no possibility of loss to the consumer, since he gets five cents worth of good candy in any event and may get several times that amount for the same money. This distinction is not valid. Under the Keppel Case, the vice of the method there condemned is that the element of chance is employed as a factor in competitive sales. While most gambling or chance games involve possible loss to the player as well as possible gain, it does not

change the character of the game as one of chance merely to remove the possibility of loss. In fact, to remove all possibility of loss would make more effective the incentive to play by removing the most forceful natural reason to refrain.

In connection with this same point, respondent argues this situation comes exactly within the statement in the Keppel Case, 291 U.S. 304, at page 313, 54 S.Ct. 423, 426, 78 L.Ed. 814, that "the statute does not authorize regulation which has no purpose other than that of relieving merchants from troublesome competition or of censoring the morals of business men." The answer to this argument is that the Keppel Case determined that the use of elements of chance of this character in competitive merchandising comes within the statute.

■ (2) Two further contentions of respondent are related in thought and will be treated together. They are that even if the method were unethical it would not authorize proscription "regardless of consequences" to the consuming public but that the Commission can act only when there is "commercial or financial injury to the consuming public." Essentially, this presents the question of "public interest" (required by the act). It is obvious that no financial loss to *consumers* can result from the method employed by respondent. But the Keppel Case seems to declare, or at least necessarily infer, that there is an injury to the consuming public through violation of the public policy opposing games of chance and to competitors through compelling them to participate in such violation or to lose business. We understand the Keppel Case as holding that it is in the public interest to prevent sales based upon games of chance and we hold that the method here used involves such a game of chance. Walter H. Johnson Candy Co. v. Federal Trade Commission, 78 F.(2d) 717, 718 (C. C.A.7). In a closely related contention, respondent asserts that even if competitors would be benefited by the order, it should not be upheld if it would work a practical disadvantage to the public. By "public" respondent means small candy manufacturers, retailers, and consumers. The argument is that this method of selling provides an economical and effective method of "advertising" which can be and is used by small manufacturing concerns which lack the financial resources to compete with large manufacturers in ordinary advertising methods, thus enabling the small concern to survive where it otherwise could not or only precariously. Further, that this method aids the retailer by increasing his volume of sales. Also, it benefits the consumer by always giving him full value (both in quality and quantity) for his expenditure and at the same time affording him an *opportunity to secure more than his money value*. This record abundantly establishes that the above advantages—financial and otherwise—are the natural results of this character of method of selling. However, we understand the main grounds for sustaining the order in the Keppel Case to be the public interest and policy in suppressing games of chance and the harmful effect upon competitors flowing from the use of such in sales. If this view is sound, the above advantages are impotent to justify this method of selling which employs an element of chance (in the sense of a gambling chance).

■ (3) Under several headings, respondent argues that the element of chance involved here has no connection with interstate commerce and is, therefore, outside the jurisdiction of the Commission. It argues that the use or nonuse of the push board is entirely within the control of the retailer after the carton has ceased to be an article of commerce and is a purely local transaction; that the board is entirely separate from the candy which can be and sometimes is sold without regard to the board; that interstate commerce in so far as respondent is concerned, ceased with receipt of the carton by the wholesaler or jobber; that if there is violation of public policy, it is purely local and is the affair solely of local authorities and not of the Commission. These arguments contain really two propositions: Interstate commerce and choice of use of the push board. Both are met by the language in Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 494, 42 S.Ct. 384, 386, 66 L. Ed. 729: "That a person is a wrongdoer who so furnishes another with the means of consummating a fraud has long been a part of the law of unfair competition." Also see Reid, Murdoch & Co. v. H. P. Coffee Co., 48 F.(2d) 817, 819–820 (C.C.A.8); Andrew Jergens Co. v. Bonded Products Corporation, 21 F.(2d) 419, 424 (C.C.A.2); Coca-Cola Co. v. Gay-Ola Co., 200 F. 720, 722 (C.C.A.6); Von Mumm v. Frash, 56 F. 830, 836 (C.C.N.Y.); New England Awl & Needle Co. v. Marlborough Awl & Needle Co., 168 Mass. 154, 155, 46 N.E. 386, 60 Am. St.Rep. 377.

■ (4) A further contention is that this method of selling "is so old and well established and so well understood and so fully approved by the public" that an order destroying it should not be sustained.

The supporting argument is as follows:

" 'There is no bar through lapse of time to a proceeding in the public interest to set an industry in order by removing the occasion for *deception* or *mistake,* unless submission has gone so far that the occasion for misunderstanding, or for any so widespread as to be worthy of correction, is already at an end. Competition may then be fair irrespective of its origin.' [Italics inserted by respondent.] Federal Trade Commission v. Algoma Lumber Co., 291 U. S. 67, 80, 54 S.Ct. 315, 320, 78 L.Ed. 655.

"In this instance, 'the occasion for misunderstanding, or for any so widespread as to be worthy of action, is wholly at an end,' even if there ever was any such occasion. The people have had over 25 years of experience with this simple selling and advertising method and thoroughly understand it, and approve it by patronage. It is with them an accepted thing.

"In the retailing of goods various customs grow up, which the public does not want to have changed until it gets ready to make the change itself, which it then does without asking anybody's permission.

"The customary use of this card-system of selling and advertising is similar to some other customs, new and old. It is like the New Orleans custom of giving laignappe. There the retailer's customer expects him to give something extra with the purchase made. Here, instead of giving the something extra, the customer uses the board to determine whether he is going to get something extra by way of the larger piece.

"We now hear, over the radio, announcements that every third person coming into a specified drugstore will get something free.

"Merchants must do things to attract the public. They have to deal with the people as they are. They must give them what pleases them. The people have these matters in their own hands. It is not for someone else to tell them what they should want. They decide that. What they decide should not be vetoed or censored, unless it is substantially harmful, and then the public itself will act. The Supreme Court recognizes that practical factor.

" 'In such matters, the public is entitled to get what it chooses, though the choice may be dictated by caprice or by fashion or perhaps by ignorance.' Federal Trade Commission v. Algoma Lumber Co., 291 U. S. 67, 78, 54 S.Ct. 315, 320, 78 L.Ed. 655.

"Many persons have no taste for commerce. Hence they enter other vocations or the government service. Being without experience as to what appeals to the public in merchandising, most of the rough and tumble things common to business offend the concepts which unfit them for business. and which they would have to get rid of if they were to hold a job with a commercial concern or were to succeed in a business of their own. If people in business give the public what it wants, they succeed; if they try to bring the public up to genteel ideals. they will fail and go broke. Experience has demonstrated that. Commercial men have to study closely the reactions of the public to their methods. If those not experienced in commercial work were to enter it, they would discover their error. They would learn to give the public what it reacts favorably to and approves, not what they think it ought to have. That is bound to be the case where people have individual liberty to follow their own inclinations. Bureaucrats think they can regiment the public and make people conform to their ideas; the merchant knows he must cater to the public. He must design his packages to appeal to the rank and file, though his designs may offend the artistic. He must use slogans and advertising matter that appeal to the rank and file, though they offend the literary. When by the use of the card customers get the big bar, the bargain becomes more strikingly realistic to them. The card serves to attract their attention and interest. As said by an experienced newspaper editor, 'While we should like to confine our homage to the god of things as they ought to be, we cannot deny homage to the god of things as they are, the public.' "

■ What constitutes "public interest" and "unfair methods of competition" within the act is a matter of definition through judicial inclusion and exclusion declared in the various situations in cases presented to the courts. Where the Supreme Court has determined that a certain situation is within the act (as in the Keppel Case) the basis and reasons for such inclusion stated ·by that court are binding as to all similar situations subject to such basis and reasoning.

The reasons advanced in support of the contention just above stated do not distinguish the Keppel Case.

■ (5) A further contention is that "there is no evil in spending for advertising some of the candy in the big pieces." The supporting argument is as follows:

"It is said that those who get one of the big bars for 5¢ get more than the others do. That is true in the case of any bargain purchase. The consumer who gets one of the big bars is benefited; but the one who gets one of the small bars is *not hurt*, because he gets his money's worth. That lack of hurt to anyone is the crucial thing. Consumers are not 'exploited.'

"If the big pieces were eliminated, then the consumers would not get the advertising expenditure and the other advantages of this method, such as getting the candy fresher, reduction of price by obviating waste and by increasing volume.

"Then none of the candy would be devoted to advertising. All consumers would have to pay in money, which would go for advertising to someone else.

"Is it to the public interest to reduce the opportunities and advantages of consumers, so that some consumers will get less than they would under the system in question?

"If it were possible to get along without advertising, we should have an entirely different situation; and it would not then be necessary to use the big bars.

"If it were not necessary to have advertising, to pay rent, or to pay taxes, no doubt everyone could be given still larger bars for 5¢ each. However, we have to deal with the situation as it is.

"The retailer's customers know that some get the large bar for 5¢. Thus they are informed how much candy is devoted to advertising, a thing they could not know if other advertising methods were used.

"The method is in all respects beneficial to the consumers. Hence, they like it and approve it."

The "evil," if it be such, of this selling method is not that the larger pieces of candy are given away, but that the entire sales method is a game of chance and such method has been declared within the Act by the Supreme Court in the Keppel Case.

■ (6) Another contention is that the "moral objection to including push cards in their cartons" by some manufacturers furnishes no ground for action by the Commission. Obviously, action by the Commission cannot rest solely upon moral or ethical views of competitors. However, there is here something beyond the mere views of others in the trade. There is the public view and public policy against gambling and games of chance and that public policy is given full force in the Keppel Case. Walter H. Johnson Candy Co. v. Federal Trade Commission, 78 F.(2d) 717, 718 (C.C.A.7).

(7) Respondent urges that the Keppel (as well as other cases) is unlike this one in that it involved exploitation of consumers (particularly children) through under size and under quality candy. Undoubtedly, the exploitation of children by the underweight and inferior quality of candy was a consideration in the Keppel Case opinion, but we think the Supreme Court did not regard such consideration as essential to the result reached by it. Hofeller v. Federal Trade Commission, 82 F.(2d) 647, 648 (C.C.A.7).

## Review of Evidence.

■ Respondent urges that it is the duty of this court to examine the evidence before the Commission and to determine for itself whether such evidence "supports" (15 U.S.C.A. § 45, p. 255) the findings of the Commission upon which its order is based. We find no necessity to determine this point of law. There is no dispute in the evidence as to the method of sales used by respondent nor as to any other fact necessary to full consideration of the various propositions and contentions advanced by respondent and treated hereinabove. The differences here are as to inferences from facts and as to rules of law.

## Validity of Act.

Respondent challenges the validity of the act. This it does under two headings. The first is really not a true challenge of the act but rather a contention that the order is directed against actions which are no part of interstate commerce. Of course, if such actions were intrastate purely, as contended, they would be outside the act itself. Hereinbefore, we have determined such actions to be within interstate commerce.

■ The other and accented challenge is that the act is invalid because it combines in the Commission the functions of complainant, prosecutor, and judge. This matter has been determined against the posi-

tion of respondent in several cases. Federal Trade Commission v. Klesner, 280 U. S. 19, 27, 50 S.Ct. 1, 3, 74 L.Ed. 138, 68 A. L.R. 838; Chamber of Commerce v. Federal Trade Commission, 280 F. 45, 48 (C. C.A.8); Federal Trade Commission v. McLean & Son, 84 F.(2d) 910, 912 (C.C.A. 7); National Harness Mfrs' Ass'n v. Federal Trade Commission, 268 F. 705, 707 (C. C.A.6); Sears, Roebuck & Co. v. Federal Trade Commission, 258 F. 307, 311, 6 A.L. R. 358 (C.C.A.7).

We conclude that this case is ruled by the Keppel Case. We so conclude since we construe the Keppel Case to determine that a method of sale which employs the element of chance as an essential feature is against public interest because it is in the nature of a gambling game and that such a method is unfair competition because it places competitors in the position where they must unwillingly adopt such method or run the risk of losing business if they refrain from so doing. Since we are unable to distinguish, in essentials, the situation in this case from the one presented in the Keppel Case, the enforcement of the order of the Commission here involved will be ordered and the petition to set aside the order will be denied.