**RAYONIER INCORPORATED,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 23646.

United States Court of Appeals
Fifth Circuit.

July 12, 1967.

William H. Adams, III, Jacksonville, Fla., for petitioner, Mahoney, Hadlow, Chambers & Adams, Jacksonville, Fla., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Clarice Feldman, Atty., N.L.R.B., Washington, D. C., for respondent.

Before PHILLIPS,* COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The Union of Powerhouse Workers, Local No. 1, was certified as the bargaining representative of the employees in the Utilities Department of the mill owned and operated at Fernandina Beach, Florida, by Rayonier Incorporated. The employer unsuccessfully contended before the National Labor Relations Board that the employees of its powerhouse did not constitute an appropriate bargaining unit. It has since refused to bargain in order that it might here challenge the Board determination. Rayonier petitions for review of the Board order of April 29, 1966, directing it to bargain (158 NLRB No. 30) and there is a cross-petition for enforcement. We grant Rayonier's petition for review, deny the cross-petition, and remand for Board reconsideration in the light of prior Board decisions.

I

In Kalamazoo Paper Box Corporation, 136 N.L.R.B. 134 (1962), the Board set forth the standards to be applied by it in determining whether a particular unit is appropriate for bargaining. It held that a severance election should be allowed only if employees in the unit sought to be severed have substantially different interests and working conditions from other employees in the production unit. In *Kalamazoo* the Board enumerated the factors to be considered in determining whether the interests of the employees are different in the following language:

"Factors which warranted consideration in determining the existence of substantial differences in interests

* Of the Tenth Circuit, sitting by designation.

and working conditions included: a difference in method of wages or compensation; different hours of work; different employment benefits; separate supervision; the degree of dissimilar qualifications, training and skills; differences in job functions * * *; the infrequency or lack of contact with other employees; lack of integration with the work functions of other employees or interchange with them; and the history of bargaining."

The Board wrote that in more recent times it had fallen into the practice of not examining the facts of each case, so that the net result had "been tantamount to a practice of automatically granting severance to truck drivers whenever requested."

The opinion continued:

"To accord automatically to a subgroup of employees such as truck drivers, severance from a larger established and stable bargaining unit merely on the basis of the existence of the traditional job classification and a request for a separate unit encompassing such classification, does not, in our opinion, adequately discharge this basic and far-reaching responsibility placed upon the Board by Congress. A title or classification in common usage does not necessarily establish that separate special interests exist and are preponderant. This can be determined only by making an informed judgment based upon an analysis of the factual circumstances bearing upon the distinguishing factors present in each case."

Recognizing that decision merely on the basis of an employee's title or job classification "tends to disregard the community of interest which he may have with other employees" and "indeed may have little relevancy to the circumstances * * *", the Board continued:

"Therefore, we believe it is both necessary and desirable for us to return to the earlier practice of determining the predominate community of interest based upon consideration of the various factors stated above. Where these factors support a conclusion that the community of interest shared by truck drivers with other plant employees outweigh those which would be the basis for severance from an existing production and maintenance unit, we shall deny severance to truck drivers. To the extent that this approach is inconsistent with that implied in prior determinations, such cases are hereby overruled."

*Kalamazoo* dealt only with truck drivers but the principles there enunciated have general application. There is no reason for according truck drivers different treatment from other groups. The Board did not regard *Kalamazoo* as restricted to truck drivers as shown by its characterization of that decision in its Twenty-Seventh Annual Report in the following language:

"The Board has never receded from its recognition in *Kalamazoo* that whether a severance election should be permitted depends upon whether the special interests of the employees involved override their general interests in common with the employees in the larger unit."

In *Kalamazoo*, the Board said in effect that to decide these questions only on the basis of a title or classification was arbitrary and in its words a "failure to discharge * * * its responsibility".

■ Section 8(b) of the Administrative Procedure Act (5 U.S.C., Sec. 1007) requires an agency in any case to include in its decision its "findings [or] conclusions, as well as the reasons or basis therefor". This requirement takes on added importance when the decision is an apparent reversal of a previously declared rule. This is not to say that the Board may not change its view of what test is to be applied in unit determination cases and what factors are to be considered in its application. If it does so, however, it should announce the change of mind and the reasons supporting the change.

In Mary Carter Paint Co. v. F. T. C., 333 F.2d 654 (5 Cir. 1964), this Court reversed an order of the Federal Trade Commission on the ground that the Commission had departed from its previously established rule. *Mary Carter* was reversed on appeal [1] but the Supreme Court did not disagree with the principle we laid down but only with its application in that case. The Supreme Court's opinion (p. 47 of 382 U.S., p. 221 of 86 S.Ct.) merely points out that the court could not say "that (the Commission's) holding constituted a departure from Commission policy".

The same principle is expressed in the concurring opinion of Judge Aldrich in Northeast Airlines, Inc. v. C. A. B., 331 F.2d 579, at 589 (1 Cir. 1964):

"The Board is free, of course, to make changes in policy, but the seriousness of this one, if that is what it is, would call not only for deep and mature thought, but for the assembly of the most cogent reasons. In the Board's opinion I find neither."

On December 28, 1966, the National Labor Relations Board decided three cases together which bear significantly on this one: Mallinckrodt Chemical Works, 162 N.L.R.B. No. 48; E. I. DuPont de Nemours and Co., 162 N.L.R.B. No. 49, and Holmberg, Inc., 162 N.L.R.B. No. 53. These cases reaffirmed the principles announced in *Kalamazoo* and applied those principles even where true craft units were involved. Applying a case by case examination of relevant factors carefully spelled out, the Board denied severance in *Mallinckrodt* and in *Holmberg, Inc.*, and granted severance in *DuPont*. It is worth noting that in *DuPont* there was no prior history of collective bargaining.

*Mallinckrodt* arose from a petition by the I.B.E.W. to sever a unit of twelve instrument mechanics from an overall production and maintenance unit. In *DuPont,* the I.B.E.W. petitioned for certification to represent a unit of electricians. In *Holmberg, Inc.*, severance was sought for a unit of tool and die makers from an overall production and maintenance unit. Lengthy analysis of the three December 28, 1966 cases will not be attempted here. Suffice to say that they clearly demonstrate the Board's adherence to the case by case analysis of relevant factors announced in *Kalamazoo*.

The Board's failure to consider *Kalamazoo* standards constitutes the main thrust of the petitioner's argument before us.

## II

The Fernandina mill was built in 1938 to produce cellulose by a continuous process operation which begins when pulpwood is delivered to the mill and ends when finished cellulose is packaged for shipment. In 1940 Rayonier voluntarily recognized the Brotherhood of Pulp, Sulphite and Paper Mill Workers as bargaining representatives for all its production and maintenance employees. From that time to the present the Pulp, Sulphite Union has represented these employees except for a unit of some ten electricians which was severed in 1955.

The Powerhouse Union filed its petition seeking certification July 1, 1965. On July 19, a hearing was held. The Pulp, Sulphite Union joined Rayonier in contesting the petition. On September 14, the Regional Director issued a decision which concluded, " * * * the Utilities Department essentially comprises the normal Powerhouse unit long recognized by the Board as entitled to severance * * * " and ordered a severance election.

The election held pursuant to the order of September 15, 1965, resulted in a majority for representation by the Powerhouse Union. The International Brotherhood of Pulp, Sulphite and Paper Mill Workers, which formerly represented these employees, intervened in the proceedings and was on the ballot in opposition to the new Union. It agrees with Rayonier that only an overall production and maintenance unit was appropriate.

1. 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128.

At this point we set forth verbatim the findings and reasoning of the Regional Director (which the Board declined to review and adopted without further findings) in his original decision of September 14, 1965, as follows:

"Petitioner seeks to sever from the existing production and maintenance unit (approximately 400 employees), a unit of Utilities Department employees, which consists of about 27 power plant employees and 7 water plant employees. Employer and Intervenor oppose severance on the ground that the departmental unit sought is neither functionally distinct nor are the employees craftsmen. Since 1940, as a result of voluntary recognition, Intervenor [The International Brotherhood of Pulp, Sulphite and Paper Mill Workers] has been recognized as the representative of production and maintenance employees including the Utilities Department, with the latest pertinent collective bargaining contract between the parties having an expiration date of June 30, 1965. All employees enjoy the same fringe and employment benefits; work essentially the same hours, use the same gate, time clock and first aid station; and are paid by the same method. Employer and Intervenor also point to the fact that most of the steam produced in the power plant is used in the various production processes and that power plant employees on occasion go into other departments. Such work, however, is normally limited to checking gauges, pumps and conveyors, etc., relating primarily to power plant responsibility.

The power plant, separated from other plant operations by firewalls, has a turbine and a boiler room which operate round-the-clock generating steam and electricity for the plant. It is manned by (4) operating engineers, (4) firemen, (4) first helpers, (4) second helpers, (3) cleanup men, (1) repairman and (4) laborers. The water plant located about 400 feet distant from the power plant, is manned by 4 water plant operators, a cleanup man and a maintenance man, and treats water for softening which is supplied directly to the power plant and some production departments of the plant. The power and water plants together comprise the Utilities Department, which is exclusively supervised, including hiring, firing, transfer of employees, etc., by the department superintendent who supervises no other employees. There is no interchange and little or no transfer between Utilities Department employees and other plant employees, with no other operations in the plant similar to the water and power plants and no other employees perform similar duties. In view of the above, and the record as a whole, including the fact that the Utilities Department essentially comprises the normal powerhouse unit long recognized by the Board as entitled to severance, I find that a unit including all regular power plant and water plant employees, i. e., the Utilities Department, is appropriate herein for severance from the existing production and maintenance unit as a functionally-distinct department. Container Corporation of America, 121 NLRB 249; Olin Mathieson Chemical Corporation, 117 NLRB 1441; General Electric Company, 123 NLRB 884."

Facts developed at the hearing in this case held July 19, 1965, as summarized in petitioner's brief and not seriously questioned by the Board's brief, are as follows:

The mill is a highly integrated operation which produces cellulose by continuous process. It is departmentalized, but the departments are not functionally different in any sense having employee-relations significance. Each department is merely a successive step in the mill's integrated process. All the departments are quite similar to one another. Most of the departments are in the same building separated by walls and partitions; they are readily accessible to each other.

Each employee in each department has his own job. Since the jobs are quite

technical, there is little transfer of employees among the departments. Nevertheless, most of the jobs are similar in that they involve the operation of heavy equipment. Depending upon an employee's level in the line of progression in his particular department, the jobs have comparable complexity.

### III

With respect to the factors outlined by the Board in *Kalamazoo*, the testimony shows no difference in interest between utilities department employees and those in other departments of the mill. We set forth here each of these factors with an appended summary of the evidence covering each factor:

*Method of Compensation:* All employees are covered by the same contract and paid on the same basis, with equivalent rates of pay for similar jobs regardless of department.

*Hours of Work:* All employees work the same hours regardless of department.

*Employee Benefits:* Rayonier's personnel and industrial relations program applies plantwide without distinction between departments. All employees have the same insurance, pension, disability, hospital, surgical, major medical and vacation program.

*Supervision:* Each department has its own supervisor and one or more lines of progression. Departmental supervisors are on duty during the day shift and on call at other times to deal with technical matters. When departmental supervisors are off duty, all departments are under the supervision of a shift superintendent with overall responsibility for the mill.

*Qualifications, Training and Skills:* Employees advance in the line of progression in the utilities department in much the same manner as they advance in line of progression in other departments. Rayonier does not require any special experience or background in considering applications of employees in the utilities department. They receive on the job training like employees in other departments. No specified period of time is required on any of the jobs in the department before an employee can progress to a higher job.

*Similarity of Job Functions:* Most of the employees in the mill are equipment operators and their helpers. The job functions of employees in all departments are therefore comparable.

*Contact with Other Employees:* Because of their job functions, utilities department employees have more contact with employees in other departments than any other production employees. The first and second helpers in the powerhouse go once each shift on a tour through the mill inspecting the various parts of the condensate return system. They stop by the machine room, the fuel oil storage tank, water reservoir, the water plant, the acid plant, the digester department and then go back to the power plant along the bark conveyor system which runs the length of the mill. For instance, when a leak is detected in one of the digester heaters, a powerhouse helper goes to the digester department to see that contaminated condensate is not returned to the boiler. On occasion powerhouse helpers help employees in the digester department to make tests to see which heater is leaking. When the pulp machine goes down, powerhouse helpers go to the machine room to coordinate the start-up.

*Integration with Work of Other Employees:* Production of pulp requires woodchips prepared in one department, cooking acid in another department and steam, water and power generated in the utilities department. These are all merged in the production process. These powerhouse employees in effect are production employees. They are responsible for the bark conveyor which runs the length of the mill. Their activities are closely coordinated with those of employees in each of the other departments.

*Interchange with Other Employees:* Most utilities department employees were transferred there from other departments. One of the men in the utilities department regularly spends two days a week working in another department, and

employees in other departments provide vacation and sickness relief in the utilities department. At least 635 man days per year of such relief is required.

*Bargaining History:* All of the production and maintenance employees of the mill (except for a unit of 10 electricians) have been represented for 25 years on a plantwide basis by the Brotherhood of Pulp, Sulphite and Paper Mill Workers.

The record is devoid of a showing that the interests, skills or working conditions of the utilities department employees differ significantly from those of the employees in any other department.

## IV

Rayonier, on September 23, requested the Board to review the Regional Director's decision. This request was denied October 27, 1965, on the ground that it raised no substantial issues. Therefore, the Regional Director's decision contained the only findings and conclusions made by the Board in its unit determination. These findings are no more than a recitation of facts developed in evidence followed by the concluding (and wholly conclusory) sentence, repeated here for emphasis:

"In view of the above, and the record as a whole, including the fact that the Utilities Department essentially comprises the normal powerhouse unit long recognized by the Board as entitled to severance, I find that a unit including all regular power plant and water plant employees, i. e., the Utilities Department, is appropriate herein for severance from the existing production and maintenance unit as a functionally-distinct department. Container Corporation of America, 121 NLRB 249; Olin Mathieson Chemical Corporation, 117 NLRB 1441; General Electric Company, 123 NLRB 884."

Most of the facts set out appear to us to require a finding that the utilities department is *not* an appropriate unit for severance. The Regional Director found that all of the production and maintenance employees (including those in the utilities department) are paid by the same method, work essentially the same hours and use the same gate, time clock and first aid station. With respect to other factors previously enunciated by the Board in *Kalamazoo* as important, the Regional Director either made no finding or his findings were incomplete and inconclusive for failure to consider their application in comparison with employees in other departments. He found, for example, that the utilities department employees were under one department superintendent, but the same is true with respect to all the employees in each of the departments. In this respect the utilities department is no different from any other department.

He made no findings at all on the question of whether the qualifications, training and skills or job functions of utilities department employees are significantly different from those of employees in other departments. As a matter of fact, the evidence shows that this is not the case.

The Regional Director found that there was little or no transfer or interchange between the utilities department and other departments of the mill, but the evidence as recited above shows that employees of the other departments provide relief for employees in the utilities department. In any event, his finding in this respect would be equally applicable under the evidence to employees in the other departments.

As recited above (Part III) the duties of the utilities department employees require them to go into each of the other departments in the mill and they thus have more contact with other employees than do employees of any other department. This is discounted by the Regional Director because the employees' powerhouse duties require it, but if contact with other employees is a factor to be considered, it should not become immaterial because it is required by an employee's departmental duties. Although the effect of severance on the integrated nature of the employer's operations was

strenuously urged by Rayonier, the Regional Director apparently ignored it in reaching his conclusions. At least he did not purport to consider the effect of severance upon the other employees in the mill or upon the employer's integrated operations.[2] The findings and reasons given all apply equally to each of the other departments. Carrying the decision to its logical extreme would result in the entire plant being fragmented into many small bargaining units with detriment to the employer and all the employees in the mill.

In spite of the plantwide bargaining for 25 years without interruption and the Board's enunciated reluctance to grant severance in the face of such bargaining history, the Regional Director failed to make any finding concerning the weight given to this factor in reaching his decision.

His basis for decision that "the utilities department essentially comprises the normal powerhouse union long recognized by the Board as entitled to severance" is precisely the approach condemned by the Board in *Kalamazoo* (adhered to in the three December 28, 1966 cases, *Mallinckrodt, DuPont* and *Holmberg, Inc.*).

### V

The three powerhouse decisions cited by the Regional Director were each decided prior to *Kalamazoo,* which was decided in 1962. *Container Corporation of America* was decided in 1958, *Olin Mathieson Chemical Corporation* was decided in 1957, and *General Electric Company* was decided in 1959. The only powerhouse case we have found that was decided by the Board after *Kalamazoo* is Granite City Steel Company, 139 N.L.R.B. 209 (1962). There the Board denied severance in a powerhouse case because, as here, the powerhouse was "an essential part of (the employer's) production process". In *Granite City* severance was denied despite a prior long history of separate bargaining by powerhouse employees with a previous employer and despite sale of part of the power produced in the department to outsiders.

■ Concededly, our review is narrowly limited. We recognize the Board's wide discretion in choosing a bargaining unit, and that the party challenging the appropriateness of that choice has the burden of showing that the Board abused its discretion, N. L. R. B. v. Schill Steel Products, Inc., (5 Cir. 1965) 340 F.2d 568, 574, But even narrow review presupposes the presence of meaningful findings and conclusions for review.

### VI

In N. L. R. B. v. Metropolitan Life Insurance Company, 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965), the Supreme Court held that Board action cannot be properly reviewed when the Board fails to articulate its reasons for its decision, that when the Board exercises the discretion conferred upon it by Congress it must disclose the basis of its order and clearly indicate that it has exercised that discretion with which Congress has empowered it. It was further held that the "court may not accept appellate counsels' *post hoc* rationalizations for agency action". To do so, said the Court "would not vindicate, but would deprecate the administrative process for it would 'propel the court into the domain which Congress has set aside exclusively for the administrative agency' ".

This Court applied these principles in N. L. R. B. v. Davis Cafeteria, Inc., 5 Cir., 358 F.2d 98 (1966).

We think this case calls for their application here. We conclude that the Board has ignored the standards set up in *Kalamazoo* and has failed thereby and otherwise to articulate the basis for its order. We view the unit determination in this case as based on classification alone, the kind of decision condemned by the Board in *Kalamazoo* and *Mallinckrodt,* supra. The Board has failed to make significant findings of fact or rational conclusions from factors announced by it to be relevant. This kind

---

2. See N.L.R.B. v. Purity Food Stores, Inc., 354 F.2d 926 (1 Cir. 1965).

of administrative action is well described in Rains, Determination of the Appropriate Bargaining Unit by the NLRB: A Lack of Objectivity Perceived,[3] 8 B.C. Ind. & Comm.L.R., 175 (Winter 1967), where the author concludes:

"As a general rule, reviewing courts ought not to psychoanalyze lower adjudicatory bodies. To do so would greatly weaken the administrative process by undermining the authority of, and confidence in, agency determinations. In Addition, accurate inferences as to subjective motivation are almost impossible. On the other hand, if the NLRB is to preserve its adjudicatory independence and finality, it must exhibit the objective, neutral reasoning which Congress assumed it would have.

"Some judicial review of administrative decisions is, of course, necessary, since agency determinations could involve misinterpretations of relevant law, or inconsistent applications of similar facts. The courts cannot provide a meaningful review of Board decisions, however, if the Board refuses to explain its rulings. Discussion of various objective factors is insufficient when these factors acquire different significance in different cases. It is meaningless for the courts to continually offer possible reasons for Board holdings because they must defer to an assumption of agency 'expertise'. If the Board's decisions are to withstand the challenge of judicial review, it should be due to the Board's open, logical, and rational reliance on the stated criteria. If the courts bend even more to rationalize and apologize for unsupported Board decisions, then the system of judicial review will have failed to provide the salutary objective consideration essential to an effective and fair quasi-judicial administration of the law.

"Analysis of the Board's appropriate bargaining unit determinations over the last twenty years reveals an apparent disregard for the neutral balance provided by the framers of the Taft-Hartley Act. The act sought to deemphasize self-organization and to reestablish the rights and free choice of the individual employee. The Board's lack of attention to this congressional purpose has been difficult to establish through normal judicial review because of the vagueness of Board opinions. And perhaps the resultant lack of admonition has encouraged the Board in the rightfulness of its policies. Judicial insistence on coherent administrative opinions, possibly stimulated by the Supreme Court's recent recognition of the problem, can force the Board to be clear and specific. Until this situation of clarity and specificity is reached, the Board's apparent lack of objectivity, and its apparent dependence on the union's extent of organizational success, will be difficult to detect and control. The Taft-Hartley Act does not deserve such unsatisfactory administration."

 We conclude that Rayonier has not unlawfully refused to bargain with the union certified by the Board and deny the Board's cross-application for enforcement of its order. We grant the petition for review and remand this case to the Board with directions that it reconsider the case and make further findings with respect to the factors enunciated by it as controlling in *Kalamazoo*, or in the alternative, that it set forth its reasons for departure from *Kalamazoo* standards.

Petition for Review granted; Cross-Petition for Enforcement denied; Remanded with directions.

---

3. See further Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv.L.R. 863, 877, setting forth the principal reasons for more specific bases of administrative determination; also Jaffe, Judicial Control of Administrative Action, Page 588.