**MARCO SALES COMPANY,** a corporation, and Marvin O. Baer, individually and as an officer of said corporation, Petitioners,

v.

**FEDERAL TRADE COMMISSION,** Respondent.

**No. 188, Docket 71–1451.**

United States Court of Appeals, Second Circuit.

Argued Nov. 15, 1971.

Decided Dec. 16, 1971.

Hays, Circuit Judge, concurred in the result and filed opinion.

Willis Hagen and Charles Rowan, Milwaukee, Wis., for petitioners.

Nicholas S. Reynolds, Atty., Ronald M. Dietrich, Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., for respondent.

Before MOORE, HAYS and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is a petition to review a cease and desist order issued by the Federal Trade Commission at the completion of an administrative proceeding initiated by a complaint charging petitioners with engaging in unfair acts and practices in violation of Section 5 of the Federal Trade Commission Act.[1] In April, 1967 the Commission held an investigational hearing and on November 27, 1968, issued its complaint against the petitioners, Marco Sales Company (Marco), an Illinois corporation and Marvin O. Baer, individually, as an officer controlling the acts and practices of the corporation. After a two-day evidentiary hearing in Chicago, Illinois, on April 15 and 16, 1969, the examiner issued his initial decision and order on June 30, 1969. Cross appeals were taken to the Commission, which heard oral argument on October 16, 1969 with four members sitting. No decision was rendered, and the Chairman of the Commission requested petitioners' permission to participate in the decision. The case was reargued before the full Commission on February 3, 1971 which issued a final order to cease and desist on February 25, 1971 in the form initially recommended by the examiner. The petition for review is granted. We reverse the order and remand to the Federal Trade Commission for further consideration consistent with this opinion.

1. The pertinent provisions of the Act are as follows:

Sec. 5(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful. (15 U.S.C. § 45(a) (1))

Sec. 5(a) (6) The Commission is empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce. (15 U.S.C. § 45(a) (6)).

Marco's method of conducting business is not in dispute. Marco sells articles by means of a lottery or game of chance in interstate commerce in various states including Connecticut, New York and Vermont. Marco sends literature through the mail to the public, describing merchandise which is sold through the device of push or punch cards. Typical merchandise includes such items as electric toasters, skillets, percolators, cameras, clocks, flower desk sets, Happy Twin dolls, Jack & Jill dolls, stuffed dogs and thermal blankets. A typical push card bears some 23 masculine and feminine names with columns on the back of the card for writing the name of the purchaser of the push corresponding to the masculine or feminine name selected. Each such card has 23 partially perforated disks which bear one of the names corresponding to those on the list. Concealed within each disk is a number which is disclosed only when the customer pushes the disk from the card. The card depicts a doll or stuffed dog or whatever the prize is, describes it and indicates the cost of each number punched out. The cost ranges from free to a maximum of 39 cents.

The push card also has a master seal under which is one of the names—this seal is not to be removed until the entire card is sold. The operator of the push cards sells the chances or pushes to his friends, family or fellow workers, and when all have been purchased, he remits the total amount to Marco which sends back two prizes—one for the lucky winner and the other for the operator. The amount received by Marco is equivalent to the selling price of the two articles. There is no claim at all that Marco is engaged in any skulduggery in its operation. The goods are delivered as represented. Marco culls its prospective customers from sales lists which it purchases. It concedes that infants may be on the list, but the Commission concedes that Marco is not deliberately cultivating the youth market. At the hearing the Commission was able to produce a 20 year old male who admitted taking one

chance and winning a doll (sex not disclosed). He also confessed to selling a chance to his 13 year old sister-in-law. His wife also testified that she sold some of his chances to minors. There was other evidence to indicate that a few 13 to 15 year olds had been enticed to take pushes or punches.

In its defense, Marco produced two professors from the University of Wisconsin who testified generally that the punch board operation provided a psychological outlet or release from tension which accounted for the widespread popularity of games of chance as marketing devices employed by a great number of giant national corporations. Marco's answer urged that its practices were consistent with the standards of fair dealing of the contemporary economic environment of the United States and therefore not in violation of Section 5 of the Federal Trade Commission Act, that the Commission's action constituted an unreasonably discriminatory application of the Act, depriving them of their liberty and property without due process in violation of the fifth amendment of the Constitution of the United States and further that it constituted an invalid exercise of police power by the Commission in violation of the fifth, ninth and tenth amendments to the Constitution of the United States. Essentially, the same points are raised in this petition for review of the order of the Commission, which directed petitioner to cease and desist from:

"Supplying to or placing in the hands of others, push cards or any other device designed or intended to be used in the sale or distribution of merchandise to the public by means of a game of chance, gift enterprise, lottery scheme, chance, or gaming device.

"Selling or otherwise disposing of any merchandise by means of a game of chance, gift enterprise, lottery scheme, chance, or gaming device."

If this were a question of first impression we would be extremely reluctant to find that the distribution of punch boards as a method of selling

dolls, skillets and blankets to teenagers, constitutes an unfair trade practice and is prejudicial to the public interest. In fact, one's faith in American youth is renewed when we find that some small segment at least is still titillated at the prospect of pushing or even punching a board where the maximum damage per punch is 39 cents and the prize is a percolator or even an electric blanket. With so many other profane, vulgar and addictive diversions made readily available to our youth, one finds it difficult to be dismayed at the survival of the bucolic pastime of punching cards. However, this is largely the business of the Federal Trade Commission, and it has pursued with relentless vigor this type of lottery over the years with the complete support of the federal bench. The basic case is FTC v. R. F. Keppel & Bro., Inc., 291

U.S. 304, 54 S.Ct. 423, 78 L.Ed.2d 814 (1934) where the Supreme Court found that a "break and take" candy operation was a lottery or gambling device and constituted an unfair practice. It should be noted that in this initial case the lottery was specifically directed to children, that some forty other candy manufacturers employed similar devices and the effects of the practice were felt throughout the "straight" penny candy industry. FTC v. R. F. Keppel & Bro., *supra*, 291 U.S. at 307–309, 54 S.Ct. 423, 78 L.Ed. 814. In any event, the basic proposition that selling merchandise by lottery constitutes an unfair practice has been supported by courts of appeals in every circuit [2] except the First where the issue has apparently not been raised.[3] Cease and desist orders by the Federal Trade Commission, enjoining

2. See Bear Sales Co. v. FTC, 362 F.2d 96 (7th Cir.), cert. denied, 385 U.S. 933, 87 S.Ct. 293, 17 L.Ed.2d 214 (1966); Dandy Products, Inc. v. FTC, 332 F.2d 985 (7th Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 648, 13 L.Ed.2d 555 (1965); Gerson v. FTC, 325 F.2d 93 (7th Cir. 1963); Wren Sales Co. v. FTC, 296 F.2d 456 (7th Cir. 1961); Peerless Products, Inc. v. FTC, 284 F.2d 825 (7th Cir. 1960), cert. denied, 365 U.S. 844, 81 S.Ct. 804, 5 L.Ed.2d 809 (1961); Goldberg v. FTC, 283 F.2d 299 (7th Cir. 1960); Surf Sales Co. v. FTC, 259 F.2d 744 (7th Cir. 1958); James v. FTC, 253 F.2d 78 (7th Cir.), cert. denied, 358 U.S. 821, 79 S.Ct. 34, 3 L.Ed.2d 62 (1958); Drath v. FTC, 99 U.S.App. D.C. 289, 239 F.2d 452 (1956), cert. denied, 353 U.S. 917, 77 S.Ct. 666, 1 L.Ed.2d 664 (1957); Seymour Sales Co. v. FTC, 94 U.S.App.D.C. 403, 216 F.2d 633 (1954), cert. denied, 348 U.S. 928, 75 S.Ct. 340, 99 L.Ed. 727 (1955); United States Printing & Novelty Co., Inc. v. FTC, 92 U.S.App.D.C. 298, 204 F.2d 737, cert. denied, 346 U.S. 830, 74 S.Ct. 52, 98 L.Ed. 354 (1953); Gay Games, Inc. v. FTC, 204 F.2d 197 (10th Cir. 1953); Zitserman v. FTC, 200 F.2d 519 (8th Cir. 1952); Consolidated Mfg. Co. v. FTC, 199 F.2d 417 (4th Cir. 1952); Lichtenstein v. FTC, 194 F.2d 607 (9th Cir.), cert. denied, 344 U.S. 819, 73 S.Ct. 15, 97 L.Ed. 638 (1952); Hamilton Mfg. Co. v. FTC, 90 U.S.App. D.C. 169, 194 F.2d 346 (1952); Globe Cardboard Novelty Co., Inc. v. FTC,

192 F.2d 444 (3d Cir. 1951); Chas. A. Brewer & Sons v. FTC, 158 F.2d 74 (6th Cir. 1946); Modernistic Candies, Inc. v. FTC, 145 F.2d 454 (7th Cir. 1944); Jaffe v. FTC, 139 F.2d 112 (7th Cir. 1943), cert. denied, 321 U.S. 791, 64 S.Ct. 790, 88 L.Ed. 1081 (1944); Wolf v. FTC, 135 F.2d 564 (7th Cir. 1943); Hill v. FTC, 124 F.2d 104 (5th Cir. 1941); Helen Ardelle, Inc. v. FTC, 101 F.2d 718 (9th Cir. 1939); FTC v. F. A. Martoccio Co., 87 F.2d 561 (8th Cir.), cert. denied, 301 U.S. 691, 57 S.Ct. 794, 81 L.Ed. 1347 (1937); Hofeller v. FTC, 82 F.2d 647 (7th Cir.), cert. denied, 299 U.S. 557, 57 S.Ct. 19, 81 L.Ed. 410 (1936).

3. Had it been raised, there doesn't seem to be much doubt of its resolution. For a classic illustration of the traditional New England attitude toward gambling see Amory v. Gilman, 2 Mass. 1, 10–11 (1806), citing, 1 Marshall, A Treatise on the Law of Insurance, 95 (1st Amer. ed. 1805): "The practice of gaming, by nourishing a constant hope of gain, excites in the mind an interest which engrosses the attention, and withdraws the exertions of men from useful pursuits. . . . it produces a contempt for the moderate, but certain, profits of sober industry. It perverts the activity of the mind, taints the heart, and depraves the affections. By frequent and great reverses of fortune, it becomes not only the source of great private misery, but suggests constant temptations to fraud, and the perpetration of atrocious crimes."

push card lotteries substantially similar to that in issue here, have been upheld by this court.[4] It has also been held that the Commission need not establish any loss of business by competitors of the seller or public injury. Where an unfair practice is established the diversion of trade from competitors, who do not employ such practices, is inferred. Deer v. FTC, 152 F.2d 65, 66 (2d Cir. 1945).

The argument that public morals have changed, that public attitudes toward gambling particularly have radically altered with various state legislatures granting absolution for such public cathartic exercises as betting on dog and horse races, jai alai, bingo and lotto, has also failed to impress courts of appeals which have adhered rigidly to the *Keppel* proscription. Bear Sales Co. v. FTC, 362 F.2d 96 (7th Cir.), cert. denied, 385 U.S. 933, 87 S.Ct. 293, 17 L.Ed.2d 214 (1966); Dandy Products, Inc. v. FTC, 332 F.2d 985, 986 (7th Cir. 1964).

■ All of this would undoubtedly have ended the saga adversely to petitioners had not the Federal Trade Commission in October, 1966 embarked upon an investigation of games of chance in the food retail and gasoline industries which resulted in the publication of an Economic Report [5] which, in turn, resulted in a Trade Regulation Rule Proceeding [6] culminating in the promulgation of a Trade Regulation Rule (16 C.F.R. § 419.1 (1971)); it was adopted on July 29, 1969, and bore an effective date of October 17, 1969.[7]

The FTC Economic Report developed *inter alia* that in 1966 some 52 different types of games were used in 55 major grocery markets to attract customers; more than half the games were derivatives of some type of gambling, including "punch cards." In 1966 there were some 39 game promoters in action with combined billings of $37.2 million. (Marco had a gross business of $150,000 in 1968.) The principal users of games were food retailers ($28.5 million) and petroleum companies ($8.5 million). The investigation revealed numerous deceptive practices including misrepresentation of the odds of winning. Retail prices were increased in some cases at least, and in some others the use of games prevented declines. In some cases the games were rigged. Many retailers claimed that they were economically coerced to utilize the games in order to effectively compete. In the course of the rule making proceedings testimony was taken, and some of the most vigorous opponents of the games, who sought their abolition rather than regulation, urged that they were "lotteries or illegal gambling devices." (See Statement of Basis, *supra* note 7, 34 Fed.Reg. at 13,308.) On the basis of its study the Commission concluded: "The proper function of a regulatory agency is to correct, by regulation if possible, unlawful activity rather than to prohibit the device altogether." Id. at 13,310. One of the devices thus regulated but not abolished was the punch board. The regulation generally prohibits misrepresentation of the odds of winning, ensures random distribution to retail outlets thus reducing the chances of rigging and requires posting of the names of the winners, the total number of game pieces distributed and the total number of prizes awarded.

4. See Rosten v. FTC, 263 F.2d 620 (2d Cir. 1959); Colon v. FTC, 193 F.2d 179 (2d Cir.), cert. denied, 344 U.S. 823, 73 S.Ct. 22, 97 L.Ed. 641 (1952); Cinader v. FTC, 141 F.2d 1022 (2d Cir. 1944).

5. FTC Staff Report to the Federal Trade Commission: Economic Report on the Use of Games of Chance in Food and Gasoline Retailing in Hearings Before the Subcomm. on Activities of Regulatory Agencies of the House Select Comm. on Small Business, 90th Cong., 2nd Sess. at 395 (1968).

6. Notice of this proceeding, including two proposed rules, was published in the Federal Register on January 7, 1969. See 34 Fed.Reg. 218 (1969).

7. See FTC, Promulgation of Trade Regulation Rule and Statement of Basis and Purpose, 34 Fed.Reg. 13,302 (1969).

The investigation of the Commission commenced two years before the complaint issued in this case. The initial decision of the Hearing Examiner on June 30, 1969 was adopted in all respects, without any further opinion, in the final order of the Commission dated February 25, 1971, some eighteen months after the adoption of the new rule.

It is at least anomalous, in our view, to regulate the games including punch boards employed to lure customers in the food retailing and gasoline industries by eliminating aspects deemed to be deceptive and to absolutely prohibit their use in the instant case where concededly there is no deception or fraud practiced at all. Marco's prizes were fully described and actually awarded; the odds are obvious, and certainly no operator was coerced into participation. It is particularly distressing that the Federal Trade Commission, in its final order, wrote no decision but merely adopted the initial decision of the Hearing Examiner which of course made no reference at all to the regulation. (The rule was not then in effect, having been adopted a month after the initial decision but some eighteen months before the final order herein.)

In argument before this court, the Commission relies substantially upon the Supreme Court's *Keppel* decision and its multi-circuit progeny, all of which were spawned long before the regulation was promulgated. The only arguments addressed to the claim of discrimination voiced by Marco are twofold: 1) the Federal Trade Commission has the sole discretion to determine how best to enforce its organic statute and 2) in any event, the "obvious" distinctions between Marco's practices and those employed by the food and gasoline retailers and the Commission's consistent policy toward and prosecution of the former practices, renders their comparison inapposite. We cannot agree at all with their position.

In support of its first contention the Commission relies on two cases, Moog Indus., Inc. v. FTC, 355 U.S. 411, 78 S. Ct. 377, 2 L.Ed.2d 370 (1958) and FTC v. Universal-Rundle Corp., 387 U.S. 244, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967). Both of these cases involve adjudicatory proceedings and stand for the proposition that even if all of a petitioner's competitors were engaged in the same practice, it is no defense to the petitioner that the cease and desist order is directed to him alone. Obviously, the Commission cannot be expected to bring simultaneous proceedings against all of those engaged in identical practices. These cases would be in point if Marco were urging that others, engaged in identical practices competing with him, were not similarly pursued by the Commission. Petitioners here do not so argue. They argue rather that those engaged in the same activity are regulated while Marco is annihilated. In short, it is not that the Commission has failed to act against others but that it has adopted a positive regulatory approach to them totally inconsistent with its approach toward petitioners.

■ There is ample authority to support the petitioners' position. As the Supreme Court pointed out in FTC v. Universal-Rundle, *supra,* 387 U.S. at 251, 87 S.Ct. at 1627, "[o]n the other hand, as the *Moog Industries* case also indicates, the Federal Trade Commission does not have unbridled power to institute proceedings which will arbitrarily destroy one of many law violators in an industry."

■ The arbitrary character of the Commission's action here consists of its total failure to even advert to, much less explain, its reason for the rigid ad hoc adjudicatory stance it adopted toward the petitioner and the flexible tolerance its industry regulation displayed to those utilizing the same or similar devices. As Circuit Judge John R. Brown pointed out in his concurring opinion in Mary Carter Paint Co. v. FTC, 333 F.2d 654, 660 (5th Cir. 1964), rev'd on other grounds, 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965): "Our complex soci-

ety now demands administrative agencies. The variety of problems dealt with make absolute consistency, perfect symmetry, impossible. And the law reflects its good sense by not exacting it. But law does not permit an agency to grant to one person the right to do that which it denies to another similarly situated. There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case."[8] To the same effect, see Marriott In-Flite Services Division of Marriott Corp. v. NLRB, 417 F.2d 563, 565–566, (5th Cir. 1969), cert. denied Local 300 United Ind. etc. v. Marriott In-Flite etc., 397 U.S. 920, 90 S.Ct. 929, 25 L.Ed.2d 101 (1970); Rayonier, Inc. v. NLRB, 380 F.2d 187, 189–190 (5th Cir. 1967); HC & D Moving & Storage Co. v. United States, 298 F.Supp. 746, 751 (D. Hawaii 1969).

■ Section 8(b) of the Administrative Procedure Act (5 U.S.C. § 557(c)) requires an agency in any case to include in its decision its findings and conclusions as well as the reasons or basis therefor. This requirement takes on added importance when the decision is apparently inconsistent with a virtually contemporaneously declared rule. See Rayonier, Inc. v. NLRB, *supra*, 380 F.2d at 189. That an administrative agency is obligated to provide petitioner with an explanation for the difference in their treatment, is well established. Secretary of Agriculture v. United States, 347 U.S. 645, 652–655, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); FTC v. Crowther, 139 U.S.App.D.C. 137, 430 F.2d 510, 514–515 (1970); ABC Freight Co. v. CAB, 391 F.2d 295, 300–303 (2d Cir. 1968); Burinskas v. NLRB, 123 U.S.App.D.C. 143, 357 F.2d 822, 827 (1966); Melody Music, Inc. v. FCC, 120 U.S.App.D.C. 241, 345 F.2d 730 (1965); City of Lawrence, Mass. v. CAB, 343 F.2d 583, 588 (1st Cir. 1965). See also Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 206–209.

As we have already indicated, the Commission has made no findings and has articulated no reasons for its disparate treatment of petitioner in light of its comprehensive rule making procedure involving investigation and hearings relating to lotteries which culminated in a determination certainly contrary to its previously consistent approach illustrated by *Keppel* and its descendants.

■ In its brief in this court and in oral colloquy in the initial hearing, but not in its opinion, the Commission suggests two distinctions between petitioner's game and those used by the food and gasoline industries, which are allegedly so obvious as to remove the need for any consideration of its new rule in this case. We find the distinctions unconvincing. The first is that the grocery and gasoline station games of chance are sales promotions to attract traffic, while petitioner's plan, though not deceptive, is used solely for the purpose of selling the merchandise offered as prizes. While this is in fact accurate, there is no effort at all made in the entire proceeding to explain how this difference has any trade regulatory significance. The *ratio decidendi* of *Keppel* was that the lottery was an illegal gambling device particularly obnoxious since aimed at children (this factor was also relied on by the Commission in the instant case) and also utilized to attract customers from the "straight" penny candy vendors. Since the gambling aspect is apparently no longer objectionable even where children are concerned, since children obviously shop in supermarkets and, unfortunately perhaps, are permitted to purchase gasoline, the two practices seem identical except that Marco is running a clean game. The Commission's investigation amply demonstrates that the reason for the adoption of sales gimmicks by retailers of food and gasoline was obviously not to satisfy the psychological

8. Although the Supreme Court reversed this decision, it did not attack the principle enunciated but rather its application to the facts.

wants of the clientele but to sell more cornflakes and gasoline than their competitors, who did not employ such methods. Marco is doing the very same thing—attempting to sell more kewpie dolls than those who use more conventional merchandising techniques. From a trade regulatory viewpoint, the economic effect on horizontal competition among competing retailers seems to be the same. In any event, the question deserves study and elucidation.

■ The second distinction suggested orally on appeal and on argument before the Commission is that the petitioner's game is a lottery since it combines the three elements (1) distribution of prizes, (2) by chance, (3) for a consideration. The retail stores schemes, however, do not involve the element of consideration, the argument runs, since the chances are free, while petitioner's game requires payment for each chance except those few which are free. Again, we are unable to appreciate the trade regulatory significance of the distinction. Obviously the Federal Trade Commission's jurisdiction is not limited to strict lotteries since it has seen fit to regulate these non-lottery operations. We read nothing in *Keppel* which indicates that its decision depended upon the presence or absence of "consideration". On the contrary, the Court did say, "Neither the language nor the history of the act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories." FTC v. R. F. Keppel & Bro., *supra*, 291 U.S. at 310, 54 S.Ct. at 425. If the evil is gambling, which purportedly leads to indolence or worse by holding out the expectation of largess, the prospect of winning an electric toaster for a maximum consideration of 39 cents per chance would seem far less seductive than the expectation of winning a thousand dollars for nothing. The modest exactions of cash re-quired by petitioner can hardly be the basis for any claim of economic gouging.

It may well be that consideration could be found in the food and gasoline retail cases in any event. While the customer pays no separate consideration for the chances, the customer does go to the store presumably to get the opportunity to win the big prize. He does change his position and incurs a detriment at the invitation of the retailer. Moreover, the retailer at least in some cases passes on the cost of the game by increasing the cost of the merchandise sold. Hence we are not persuaded on the basis of the record before us that the regulated games are in fact at all differentiated by the claim of lack of consideration. See Comment, Examination of Games of Chance and Referral Selling as Sales Promotional Devices, 17 Kan.L.Rev. 668, 669–71 (1969); 31 Ohio St.L.J. 610, 616 (1970). See also Ollendorff Watch Co. v. Pink, 279 N.Y. 32, 17 N.E.2d 676 (1938).

The Commission has promulgated a rule which it announced it would restudy in eighteen months. We believe it is appropriate to reverse the order and remand this matter for reconsideration in light of the new regulation, to study and explain the differences, if any, between petitioners' practices and those presently regulated in so far as they have relevance under the Federal Trade Commission Act.

Reversed and remanded.

HAYS, Circuit Judge (concurring in the result):

I concur on the ground that the Commission has failed to explain the difference, for the purposes of trade regulation, between the scheme condemned in the present case and the schemes approved in the Commission's Trade Regulation Rule 19 C.F.R. 419.1 (1971).